UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JIMMIE LEE HARRISON,

    Plaintiff,

v.

PRAGNA H. PANDYA, *et al.*,

    Defendants.

Case No. 1:09-cv-349

Hon. Gordon J. Quist

_____/

## REPORT AND RECOMMENDATION

This is a civil rights action brought by a former state prisoner pursuant to 42 U.S.C. § 1983.[1] This matter is now before the court on a motion for summary judgment filed by defendants Caruso, Willard, Mulnix, Bowker and Higbie (collectively referred to as the "MDOC defendants") (docket no. 62) and a motion for summary judgment filed by defendants Sherry, Marble and Correctional Medical Services, Inc. (CMS) (collectively referred to as the "CMS defendants") (docket no. 99).

### I.    Background

Plaintiff's *pro se* amended complaint has named 13 defendants: Dr. Pragna H. Pandya; Dr. Christine Meyer; Diana Marble; P.A. Brendon Sherry; Dr. Robert Migliorino; Registered Dietician Patricia Willard; Health Unit Manager (HUM) Leonza Hudson; Pharmacy Technician Janet Higbie; R.N. Brenda Bowker; R.N. Barbara Mulnix; R.N. Cheryl Novak; MDOC Director Patricia Caruso; and CMS. *See* docket no. 8. Plaintiff has alleged that defendants violated

---

[1] Plaintiff has been paroled and lives in Saginaw, Michigan. *See* Change of Address (docket no. 118); Offender Tracking Information Service (OTIS) database accessible at www.michigan.gov.

his Eighth Amendment rights and seeks monetary damages and injunctive relief. Given the divergent nature of plaintiff's claims, the court will address plaintiff's allegations as they pertain to each defendant.

## II. Legal standard

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the standard for deciding a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case. Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d at 478-79 (citations omitted). "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). However, the court is not bound to blindly adopt a non-moving party's version of the facts. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### III. Plaintiff's amended complaint, responses and affidavits

#### A. Plaintiff's amended complaint

Fed. R. Civ. P. 56(c)(4) provides that an affidavit or declaration used to support or oppose a motion for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." For purposes of summary judgment, a verified complaint carries the same weight as an affidavit. *See Lavado v. Keohane*, 992 F.2d 601, 605 (6th Cir. 1993) (a verified complaint has the same force and effect as an affidavit for purposes of responding to a motion for summary judgment). Plaintiff has attempted to file a verified amended complaint by attaching a sheet which states as follows: "I Jimmie Harrison swear that the forgoing is true and correct to the best of my knowledge under the penalty of perjury." *See* Amend. Compl. The sheet also has a notary public's stamp but no notary jurat or signature. While this is not a notarized affidavit, plaintiff's statement substantially complies with the requirements for creating an unsworn declaration under perjury as authorized under 28 U.S.C. § 1746.[2] Extensive portions of the amended complaint consist of citations to documents or barely intelligible phrases that cannot be construed

---

[2] Section 1746 provides in pertinent part as follows:

Wherever, under any law of the United States or under any rule, regulation, order, or requirement made pursuant to law, any matter is required or permitted to be supported, evidenced, established, or proved by the sworn declaration, verification, certificate, statement, oath, or affidavit . . . such matter may, with like force and effect, be supported, evidenced, established, or proved by the unsworn declaration, certificate, verification, or statement, in writing of such person which is subscribed by him, as true under penalty of perjury, and dated, in substantially the following form: . . . .

(2) If executed within the United States, its territories, possessions, or commonwealths: "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date).

(Signature)".

3

as facts under Fed. R. Civ. P. 56(c)(4). Nevertheless, the court will construe plaintiff's intelligible allegations as to dates, events, places and people as verified statements of facts for purposes of responding to defendants' motions for summary judgment.

### B. Plaintiff's response to the MDOC defendants' motion

Plaintiff has not filed a separate affidavit in response to the motion for summary judgment filed by the MDOC defendants. Rather, plaintiff has attempted to transform his over-sized (34-page) responsive brief into a verified statement or affidavit by placing the following statement at the end of the response, "I the plaintiff swear that all that has been said is the truth to the best of the plaintiff [sic] Knowledge and Belief." *See* Response at p. 33 (docket no. 93). This statement is not an appropriate verification made "under penalty of perjury" as authorized under § 1746. Furthermore, plaintiff cannot transform his brief, which consists of legal arguments, into a statement of "facts" under Fed. R. Civ. P. 56(c). *See generally, Resolution Trust Corporation v. Juergens*, 965 F.2d 149, 152 (7th Cir. 1992) (prosaically stating that "Just as 'One swallow does not make a spring,' so the mere attachment of a jurat does not automatically make an affidavit" under Rule 56) (footnote omitted). Accordingly, the court does not construe plaintiff's response as an affidavit under Fed. R. Civ. P. 56(c).

### C. Plaintiff's affidavits in response to the CMS defendants' motion

Plaintiff has filed two documents which he refers to as "affidavits" in opposition to the motion for summary judgment filed by the CMS defendants. The first document, entitled "Plaintiff Harrison Affidavit [sic]" is properly notarized and relates to plaintiff's claims against defendant Marble. *See* Plaintiff's Affidavit (docket no. 108-1). The second document is entitled "Plaintiff Affidavit Concerning Defendant Sherry [sic]." This document is not an affidavit. While

4

this document was signed by a Michigan notary, it did not contain a notary jurat vouching for the truthfulness of the signed record. *See* M.C.L. § 55.265(a) (" 'Jurat' means a certification by a notary public that a signer, whose identity is personally known to the notary public or proven on the basis of satisfactory evidence, has made in the presence of the notary public a voluntary signature and taken an oath or affirmation vouching for the truthfulness of the signed record"). "The absence of a jurat or other evidence of verification requires a finding that the document fails to constitute an affidavit." *Knobloch v. Langholz*, No. 231070, 2002 WL 1360388 at *2 (Mich. App. June 21, 2002) (unpublished). "A purported affidavit, on which perjury could not be assigned if it was wilfully false, would not, in law, be an affidavit at all." *Kelley v. City of Flint*, 251 Mich. 691, 696; 232 N.W. 407 (1930). Accordingly, the court does not view the latter document as an affidavit for purposes of resolving the CMS' defendants' motion for summary judgment.

### D. Plaintiff's "affidavit" pursuant to Fed. R. Civ. P. 56(f)

Plaintiff has submitted another purported affidavit styled "Affidavit from the plaintiff Harrison pertaining to Fed. R. Civ. Proc. 56(f), (1), (2) and (3), concerning the defendants below Pragna H. Pandya, Christine Meyer, Robert Mogliorino, Patricia Willard, Leonza Hudson, Janet Higbie, Brenda Bowker, Barbara Mulnix, Cheryl Novak, Patricia Caruso [sic]." *See* docket no. 112. Plaintiff cited the former Fed. R. Civ. P. 56(f) (now Fed. R. Civ. P. 56(d)), which provides that "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order."

As an initial matter, this document is not an affidavit because it lacks a notary jurat. *See* M.C.L. § 55.265(a); *Kelley*, 251 Mich. at 696; *Knobloch*, 2002 WL 1360388 at *2. Even if this document was properly notarized, it does not comply with the requirements of Fed. R. Civ. P. 56(d) because it consists of legal arguments, not "specified reasons" why plaintiff cannot present facts essential to justify his opposition to defendants' motions for summary judgment. In this regard, plaintiff's filings in this case demonstrate that he has possession of numerous documents related to his claims. Plaintiff submitted approximately 140 pages of medical and prison records with his original complaint. *See* docket nos. 1-2, 1-3 and 1-4. Plaintiff filed an additional 60 pages of medical records and other documents attached to his response to the MDOC defendants' motion for summary judgment and a few more pages of records attached to his response to the CMS defendants' motion for summary judgment. *See* docket nos. 93-2 and 108-3. Plaintiff's "affidavit" is an improper supplemental response to defendants' motions for summary judgment. Accordingly, the court will give it no consideration.

### IV.    Eighth Amendment Claims

Plaintiff seeks relief pursuant to 42 U.S.C. § 1983, which confers a private federal right of action against any person who, acting under color of state law, deprives an individual of any right, privilege or immunity secured by the Constitution or federal laws. *Burnett v. Grattan*, 468 U.S. 42, 45 n. 2 (1984); *Stack v. Killian*, 96 F.3d 159, 161 (6th Cir.1996). To state a § 1983 claim, a plaintiff must allege two elements: (1) a deprivation of rights secured by the Constitution and laws of the United States, and (2) that the defendant deprived him of this federal right under color of law. *Jones v. Duncan*, 840 F.2d 359, 360-61 (6th Cir. 1988); 42 U.S.C. § 1983.

It is well established that an inmate has a cause of action under § l983 against prison officials for "deliberate indifference" to his serious medical needs, since the same constitutes cruel and unusual punishment proscribed by the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97 (l976). A viable Eighth Amendment claim consists of an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). A court considering a prisoner's Eighth Amendment claim must ask both if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation and if the officials acted with a sufficiently culpable state of mind. *Hudson v. McMillian*, 503 U.S. 1, 8 (1992).

The objective component requires the infliction of serious pain or failure to treat a serious medical condition. *Hudson*, 503 U.S. at 8-9. With respect to the infliction of serious pain, courts recognize that "[b]ecause routine discomfort is part of the penalty that criminal offenders pay for their offenses against society, only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." *Id.* at 8 (internal citations and quotation marks omitted). Similarly, "[b]ecause society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Id.* at 9.

The subjective component requires that the defendant act with deliberate indifference to an inmate's health or safety. *See Wilson v. Seiter*, 501 U.S. 294, 302-03 (1991). To establish the subjective component, the plaintiff must show that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. Mere negligence in diagnosing or treating a medical condition

7

does not constitute an Eighth Amendment violation. *Id.* at 835. "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishment Clause." *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

### A. MDOC Director Caruso

Plaintiff has sued Director Caruso in her official capacity, claiming that she entered into a contract with CMS, an incompetent health care company, and that he suffered as a result. Amend. Compl. at p. 3 and ¶12. Plaintiff's § 1983 claim for monetary damages against the director in her official capacity is barred by Eleventh Amendment immunity. *See Will v. Department of State Police*, 491 U.S. 58, 64-71 (1989); *Rodgers v. Banks*, 344 F.3d 587, 594 (6th Cir. 2003) ("the Eleventh Amendment bars § 1983 suits seeking money damages against states and against state employees sued in their official capacities"). Accordingly, Director Caruso is entitled to summary judgment on plaintiff's claim.

### B. Defendants Higbie, Willard, Mulnix and Bowker

It is undisputed that plaintiff was diagnosed with ulcerative colitis. While defendants Higbie, Willard, Mulnix and Bowker concede that this condition presents a "serious medical need" for purposes of the Eighth Amendment, defendants deny that they were deliberately indifferent to this need. *See* Defendants' Brief at pp. 15-17 (docket no. 63).

#### 1. Pharmacy Technician Higbie

Plaintiff alleged that Ms. Higbie, a pharmacy technician, violated his constitutional rights because she dispensed a medication to him (Sulindac, sometimes referred to under the brand name Clinoril) which had an FDA warning and then continued to give him the medication after the order for the medication was discontinued by the medical provider. Amend. Compl. at ¶ 8; *See* Exh.

8

F attached to Complaint (docket no. 1-2 at p. 7).³ On May 9, 2006, plaintiff was dispensed 60 tablets of the Sulindac with instructions to take the tablets twice daily. *See* Exh. F attached to Complaint (docket no. 1-2 at p. 7). Plaintiff alleged that this medication causes people with ulcers to bleed, that Higbie re-issued the medication on June 26, 2006, and that he suffered pain and a bloody stool on that date. Amend. Compl. at ¶ 7(F). Plaintiff also alleged that Higbie told Resident Unit Officer (RUO) W. Patton to confiscate the medication on June 28, 2006. *Id.*

Ms. Higbie set forth the following facts in an affidavit in support of her motion for summary judgment. At all times relevant to this lawsuit she was employed by the MDOC as a pharmacy technician at the Riverside Correctional Facility (RCF). Higbie Aff. at ¶ 1 (docket no. 63-14). Dr. Pandya initiated the Clinoril order on May 8, 2006 and entered the order into SERAPIS.⁴ *Id.* at ¶ 3. The order was to begin on May 8, 2006 and expire on August 11, 2006. *Id.*; RCF Medical Records at B-2 (docket no. 68). Ms. Higbie received two requests from plaintiff stating that he needed additional Clinoril. *Id.* at ¶ 4. After verifying that the prescription was still active, she placed orders for plaintiff on May 20, 2006 and June 18, 2006. *Id.* The Clinoril was sent from PharmaCorr on May 30 and June 19, 2006, respectively. *Id.* at ¶ 6. Dr. Meyer discontinued the medication on July 10, 2006, and Ms. Higbie did not re-issue the medication after that date. *Id.* at ¶ 7. Ms. Higbie also denied plaintiff's allegation that she instructed RUO Patton to confiscate the medication, stating that RUO Patton confiscated 44 tablets of "Clinoril-Sulindac" and 38 tablets of

---

³ Although plaintiff's original complaint has been superseded by his amended complaint, the amended complaint refers to and relies upon exhibits attached to the original complaint.

⁴ By way of background, "SERAPIS" is the electronic medical records system used by the MDOC. *See Hadix v. Caruso*, No. 4:92-cv-110, 2007 WL 2701972 at *7 (W.D. Mich.) (Order, Sept. 10, 2007). In December 2006, the court entered a permanent injunction, one element of which explicitly ordered that the MDOC establish connectivity between SERAPIS and the electronic systems of PharmaCorr, Inc., the pharmacy provider to the MDOC. *Id.*

Sulfazine during a shakedown of plaintiff's property. *Id.* at ¶ 8. RUO Patton later brought the tablets to Ms. Higbie for inspection. *Id.*

An issue of fact exists with respect to whether Ms. Higbie was authorized to dispense Clinoril to plaintiff in May and June 2006. Plaintiff's medical transfer records for RFC, dated May 2, 2006, include a prescription for Clinoril. *See* RFC Medical Records at B-2. As previously discussed, Dr. Pandya issued a prescription for Clinoril from May 8, 2006 through August 11, 2006. However, on June 28, 2006, defendant P.A. Sherry noted that according to plaintiff's chart, the Clinoril was discontinued by an order issued on May 26, 2006 and that plaintiff had Clinoril in his cell "administered to him by pharm in error." *See* RCF Medical Records at B-7 (docket no. 68). P.A. Sherry's observations appear at odds with an orders summary prepared by R.N. Bowker on May 26, 2006, which does not include an order to discontinue the Clinoril on that date. *See* RCF Medical Records at B-4. As Ms. Higbie pointed out in her affidavit, Dr. Meyers did not issue an order to discontinue the Clinoril until July 10, 2006.

In their brief, defendants provide the following explanation for the discrepancy in the Clinoril prescription:

> There was a discrepancy in the medication orders for Clinoril: a doctor at IMAX had apparently discontinued the drug on May 26, 2006, but that order did not get into the records. Dr. Pandya issued the drug beginning May 8, 2006 to expire August 11, 2006. When someone discovered the earlier IMAX discontinuance, the drug was removed from Plaintiff's cell. But Plaintiff did not ever tell anyone that the drug had been discontinued; in fact, he kept reordering it. The Clinoril was formally discontinued by Dr. Meyer on July 10, 2006. Dr. Meyer said there was no medical contraindication for Clinoril for Plaintiff's diagnosed ulcerative colitis. Any mistake regarding continuing the Clinoril after May 26, 2006 was not made with an intention to harm the Plaintiff; indeed, Dr. Pandya ordered it to continue to August 11, 2006. In addition, in an abundance of caution, where there was a conflicting prior order, the drug was confiscated from Plaintiff.

10

Defendants' Brief at pp. 16-17. While most of the facts set forth in defendants' argument are supported by the uncontested record before the court, there is no evidence regarding the IMAX doctor or circumstances under which this doctor purportedly discontinued the Clinoril on May 26, 2006. Plaintiff was incarcerated at RCF (as opposed to IMAX) when that order was written, and that an RCF physician (Dr. Meyers) did not discontinue the Clinoril until July 10, 2006. In addition, plaintiff does not deny that he requested Clinoril from the Ms. Higbie on two occasions after the May 26, 2010 order to discontinue the medication, and that he had 44 Clinoril tablets in his cell during the shakedown.

Assuming that the IMAX doctor issued an order to discontinue Clinoril on May 26, 2006, there is no evidence that Ms. Higbie was deliberately indifferent in ordering the medication after that date. Plaintiff was not a resident at IMAX at that time. On May 30 and June 18, 2006, while incarcerated at RCF, plaintiff requested refills of Clinoril which Dr. Pandya had prescribed on May 8, 2006. Ms. Higbie verified the prescription before ordering it. The medication was not discontinued by plaintiff's resident medical providers at RFC until July 10, 2006, and Ms. Higbie did not order or dispense Clinoril after that date. Under these circumstances there is no evidence that Ms. Higbie met the subjective component of an Eighth Amendment claim, i.e., that she knew of and disregarded an excessive risk to plaintiff's health and safety. *Farmer*, 511 U.S. at 837. At most, the evidence demonstrates that Ms. Higbie's actions were the result of "inadvertence or [an] error in good faith," neither of which support an Eighth Amendment claim. *See Whitley*, 475 U.S. at 319. *See e.g., Rumsey v. Michigan Department of Corrections*, 327 F. Supp. 2d 767, 777 (E.D. Mich. 2004) (observing that plaintiff prisoner's allegations surrounding the alleged mix-up of his

prescription by prison health care staff "shows nothing more than negligence, if that"). Accordingly, Ms. Higbie's motion for summary judgment should be granted.

### 2. R.N. Mulnix

Plaintiff alleged that R.N. Mulnix was responsible for making sure that plaintiff received his therapeutic low residue diet and notifying Mr. Brad Purves, the facility's food service director of the diet. Amend. Compl. at ¶ 10. Plaintiff alleged that he received the "Night Time Snack Bag" portion of the diet only once since it was ordered on June 28, 2006, and had to advise Mulnix of this in a letter dated July 12, 2006. *Id.* Plaintiff alleged that Mulnix has been deliberately indifferent towards "the things" he needs for his chronic ulcerative colitis. *Id.*

R.N. Mulnix set forth the following facts in her affidavit. She wrote a Therapeutic Diet Notice on May 26, 2006, per Dr. Migliorino's order for a therapeutic diet. Mulnix Aff. at ¶ 3 (docket no. 69). R.N. Mulnix stated that she placed a copy of the notice in plaintiff's file, sent him a copy, and sent an e-mail to several individuals regarding the diet including Mr. Purves, Assistant Food Service Director Sherri Hayden, Registered Dietician Willard, and Ms. Leona Davis (at Medical Records). *Id.* In addition, R.N. Mulnix completed a Special Accommodation Notice (SAN) on May 29, 2006, adding the low residue diet as an accommodation. *Id.* at ¶ 4. Copies of the SAN were sent to Mr. Purves, plaintiff's housing unit and plaintiff. *Id.* R.N. Mulnix completed another Therapeutic Diet Notice on June 28, 2006, which was a renewal order for the previous notice and included the addition of a night time snack bag ("HS snack bag"). *Id.* at ¶ 5. The new notice was distributed in the same manner as the original notice. *Id.* In addition, Physician's Assistant (P.A.) Sherry wrote a new diet order which included the HS snack bag. *Id.*

On July 10, 2006, plaintiff sent P.A. Sherry a kite advising that he was not receiving the HS snack bag. *Id.* at ¶ 6. On July 12th, plaintiff sent a kite to Mulnix and a Health Care Request raising the same complaint. *Id.* On July 13th, Mulnix completed another Therapeutic Diet Notice to renew the low residue diet with an HS snack bag and distributed it in the same manner as the previous notices. *Id.* The response to plaintiff's Health Care Request was sent on July 14th and stated that "it was all sent yesterday." *Id.*

The record does not reflect that R.N. Mulnix engaged in any wrongful conduct. She wrote three Therapeutic Diet Notices, distributed them to both the food service director and the assistant food service director, prepared a SAN and responded promptly when plaintiff complained about not receiving the HS snack bag. There is no evidence that R.N. Mulnix was deliberately indifferent to plaintiff's serious health needs. Accordingly, R.N. Mulnix's motion for summary judgment should be granted.

### 3. Registered Dietician Willard

Plaintiff alleged that his dietician, Patricia Willard, failed to provide him with adequate medical care "by not assuring" that plaintiff received a therapeutic low residue diet and failing to provide him with this diet until July 10, 2006. Amend. Compl. at ¶ 6. In her affidavit, Ms. Willard stated that the initial Therapeutic Diet Notice was written on May 29, 2006 by R.N. Mulnix per the order of Dr. Migliorino; that plaintiff stated that he was receiving the therapeutic diet meal when Willard met with plaintiff on June 1, 2006; and that plaintiff did not request a night time snack bag during the meeting. Willard Aff. at ¶ 4 (docket no. 63-10); RCF Medical Records at B-6. Plaintiff has not submitted any affidavits or documentary evidence to contradict the statements as set forth in Ms. Willard's affidavit. Contrary to plaintiff's allegations, he was receiving a

13

therapeutic low residue diet when he met with Ms. Willard on June 1, 2006. As previously discussed, R.N. Mulnix was responsible for issuing orders on the diet and corrected the alleged mix-up involving the the HS snack bag. Nothing in the record indicates that Ms. Willard was deliberately indifferent to plaintiff's need for a low residue therapeutic diet. Accordingly, her motion for summary judgment should be granted.

### 4. R.N. Bowker

Plaintiff alleged that R.N. Brenda Bowker was the first Health Care staff to examine him when he returned from Ionia Memorial Hospital with the diagnosis of ulcerative colitis and that she "did not assure" that plaintiff received all of his medication and the therapeutic diet to treat this condition. Amend. Compl. at ¶ 9. Plaintiff also included rambling allegations regarding prescriptions for Prednisone and the Clinoril. *Id.* R.N. Bowker set forth the following facts in her affidavit. She was not the first staff member to see plaintiff upon his return from the hospital. Bowker Aff. at ¶ 3 (docket no. 63-8). The records reflect that Nurse Novak was the first staff member to see him upon his return on May 25, 2006 at 6:05p.m. *Id.*; RCF Medical Records at B-4. R.N Bowker saw plaintiff the next day and took his vital signs at 8:08 a.m. Bowker Aff. at ¶ 4; RCF Medical Records at B-4. Then plaintiff was seen by Dr. Migliorino who evaluated him, ordered lab work, medication and a diet referral. Bowker Aff. at ¶¶ 4-5. R.N. Bowker subsequently issued plaintiff the medication Prednisone pursuant to Dr. Migliorino's order. *Id.* at ¶ 6; RCF Medical Records at B-4.

R.N. Bowker explained that she issued the prednisone from the RCF inventory (which was in the form of 5 mg tablets) until the 20 mg tablets arrived from the supplier PharmaCorr:

14

> I issued the medication "Prednisone" to prisoner Harrison per Dr. Migliorino's order for medication. The medication was pulled from the RCF inventory of "Prednisone." Please note Exhibit D [attached to plaintiff's complaint]; the label states "Physician Dispense Box" indicating the medication was from RCF. The order from Dr. Migliorino was for 20 MG tablets; RCF only had 5 MG tablets for dispensing. Therefore, prisoner Harrison was issued the 5 MG tablets of "Prednisone" with instructions of taking 4 tablets, 3 times daily for 4 days to meet the 20 MG dose ordered by Dr. Migliorino. I also provided instructions for prisoner Harrison to take 4 tablets, only 2 times daily after 4 days, to meet the 20 MG dose ordered by Dr. Migliorino. I issued enough tablets to insure prisoner Harrison was able to take the medication until the order from PharmaCorr was received and dispensed.

Bowker Aff. at ¶ 6. In addition, R.N. Bowker noted that she was not instructed to complete the Therapeutic Diet Notice for plaintiff and that R.N. Mulnix completed that particular form. *Id.* at ¶ 7. Finally, R.N. Bowker stated that plaintiff did not return any medication to her, that plaintiff did not inform her that the Clinoril had been discontinued, and that according to SERAPIS, the Clinoril did not expire until August 11, 2006. *Id.* at ¶ 9.

The record does not reflect that R.N. Bowker engaged in any wrongful conduct with respect to the Prednisone orders, the Therapeutic Diet Notice or the Clinoril order. R.N. Bowker provided plaintiff with 5mg Prednisone tablets from the RCF inventory in an amount intended to be the equivalent of the 20 mg Prednisone tablet which Dr. Magliorino prescribed. While plaintiff apparently disputes the fact that he received multiple doses of 5 mg tablets as opposed to a daily dose of a single 20 mg tablet, this dispute cannot form the basis for a federal constitutional claim. The Sixth Circuit distinguishes "between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment." *Westlake v. Lucas*, 537 F.2d 857, 860 n. 5 (6th Cir. 1976). This action falls in the latter category. "Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments

15

and to constitutionalize claims which sound in state tort law." *Id. See Owens v. Hutchinson*, 79 Fed. Appx. 159, 161 (6th Cir. 2003) ("[a] patient's disagreement with his physicians over the proper medical treatment alleges no more than a medical malpractice claim, which is a tort actionable in state court, but is not cognizable as a federal constitutional claim"). *See also*, *Woodberry v. Simmons*, 146 Fed.Appx. 976, 977 (10th Cir. 2005) ("a difference of opinion between a prisoner and the prison medical staff about medical treatment does not constitute deliberate indifference").

In addition, plaintiff has no federal constitutional claim against R.N. Bowker with respect to the Therapeutic Diet Notices. It was R.N. Mulnix, not R.N. Bowker, who wrote the Therapeutic Diet Notices. Finally, there is no evidence that R.N. Bowker was involved in ordering or delivering the Clinoril to plaintiff. Accordingly, R.N. Bowker's motion for summary judgment should be granted.

### C. Defendants Marble, Sherry and CMS

#### 1. Diana Marble

Plaintiff alleged that Diana Marble was his health care provider from June 5, 2006 until some unknown date and that she failed to provide plaintiff with adequate health care treatment for his chronic back pain, right forearm and ulcerative colitis. Amend. Compl. at ¶ 3. Plaintiff also alleged that Marble interfered with his treatment of ulcerative colitis. *Id.* at ¶ 3.[5] Defendant Marble does not address the merits of plaintiff's claims but asserts that she was on sick leave during the relevant time period. In her affidavit, Marble stated: that she went on sick leave from RCF on April 12, 2006; that she did not return to work until May 15, 2006, at which time she was placed at the

---

[5] Plaintiff's remaining allegations against this defendant consist of citations to health care requests and random statements (e.g., "[a]lso put at risk no one contacted the Plaintiff concerning NOROVIRUS"). Amend. Compl. at ¶ 3.

16

Carson Correctional Facility; and that she did not provide any health care services at RCF after April 12, 2006. Marble Aff. at ¶¶ 1-4 (docket no. 99-3).[6] While Marble's affidavit points out her absence from RFC, it does not address whether she was involved in plaintiff's health care. Plaintiff points out that Marble is listed as his medical provider on a SAN dated June 5, 2006, which included accommodations to housing, work assignment and the therapeutic diet. *See* Plaintiff's Aff. at ¶¶ 1-4 (docket no. 108-1).

Viewing the evidence in the light most favorable to plaintiff, the court concludes that plaintiff's claim fails. The only evidence presented by plaintiff relating to treatment by Ms. Marble is that he received a copy of the June 5, 2006 SAN. Plaintiff has not identified any other document or treatment provided by Marble during the relevant time period. Plaintiff has provided no evidence that Marble was deliberately indifferent to his serious health needs in this action. Her motion for summary judgment should be granted.

**2. P.A. Sherry**

Plaintiff alleged that P.A. Sherry violated his constitutional rights by failing to provide plaintiff with the Health Service night time snack bag, which was to prevent his stomach from hurting when he took medication (Alzulfidine). Amend. Compl. at ¶ 4. As previously discussed, on June 28, 2006, P.A. Sherry ordered that plaintiff receive a "low residue diet with HS snack bag effective from 6/28/2006 to 12/29/2006." *See* Diet Order (June 28, 2006) (docket no. 1-2 at p. 33). In a kite to P.A. Sherry dated July 10, 2006, plaintiff stated:

---

[6] Ms. Marble's affidavit does not identify her profession (i.e., whether she is a nurse, nurse practitioner, P.A., etc.).

17

> I've only gotten my night time snack bag a few times since you issued the paper work. The kitchen says the [sic] need the paper work. You've been pretty nice could you please take care of this. Than you and God bless you.

Letter to P.A. Sherry (July 10, 2006) (docket no. 99-5).

Viewing the evidence in the light most favorable to plaintiff, the court concludes that plaintiff's claim fails. At most plaintiff has pointed out some type of error or mis-communication with respect to the preparation of the snack bag. When plaintiff notified P. A. Sherry that he had received the snack bags only "a few times," the order for the snack bags had been in existence for less than two weeks. While the lack of a nightly snack bag for a few days was certainly an inconvenience, it does not rise to the level of a constitutional violation. Furthermore, there is no evidence that P.A. Sherry acted wantonly. As previously discussed, R.N. Mulnix addressed the alleged mix-up of plaintiff's snack bags shortly after plaintiff sent kites on the issue. Accordingly, P.A. Sherry's motion for summary judgment should be granted.

### 3. CMS

Plaintiff alleged that CMS failed to provide plaintiff with adequate health care: by not giving him adequate medication after May 26, 2006; denial of a referral to see a specialist; and denied of pain medication that would relieve plaintiff of "chronic issues" related to his ulcerative colitis, as well as lower back, upper right back and right forearm pain. Amend. Compl. at ¶ 13. A plaintiff who sues a private or public corporation for constitutional violations under 42 U.S.C. § 1983 must establish that a policy or custom caused the alleged injury. *Sova v. City of Mt. Pleasant*, 142 F.3d 898, 904 (6th Cir. 1998); *Street v. Corrections Corporation of America*, 102 F.3d 810, 818 (6th Cir. 1996). The Sixth Circuit has held that like a municipal corporation, "CMS's liability must also be premised on some policy that caused a deprivation of [a prisoner's] Eighth Amendment rights."

*Starcher v. Correctional Medical Systems, Inc.*, 7 Fed. Appx. 459, 465 (6th Cir. 2001). Thus, in order to state a § 1983 claim against CMS, plaintiff "must allege the existence of a policy, practice or custom that resulted in the injury." *Moreno v. Metropolitan General Hosp.*, No. 99-5205, 2000 WL 353537 at *2 (6th Cir. March 28, 2000). "It is not enough for a complaint under § 1983 to contain mere conclusory allegations of unconstitutional conduct by persons acting under color of state law. Some factual basis for such claims must be set forth in the pleadings." *Chapman v. City of Detroit*, 808 F.2d 459, 465 (6th Cir. 1986). *See Bartalone v. Berrien County*, 643 F. Supp. 574, 578-79 (W.D. Mich. 1986) (a plaintiff in a § 1983 action "must allege sufficient facts to establish the probable existence of the pattern, custom, or policy of which [he] complains.").

Here, plaintiff has neither alleged nor demonstrated sufficient factual matters to establish the existence of a CMS policy that violates the Eighth Amendment. Rather, plaintiff seeks to make CMS vicariously liable for the actions of its employees who actually treated him. It is well established that "[a] defendant cannot be held liable under section 1983 on a respondeat superior or vicarious liability basis." *Street v. Corrections Corporation of America*, 102 F.3d 810, 818 (6th Cir. 1996), citing *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978). Accordingly, the court should grant CMS' motion for summary judgment.

V. **Recommendation**

For the reasons set forth above, I respectfully recommend that the motion for summary judgment filed by defendants Caruso, Willard, Mulnix, Bowker and Higbie (docket no.

62) and the motion for summary judgment filed by defendants Sherry, Marble and CMS (docket no. 99) be **GRANTED** and that these defendants be dismissed from this action.

Dated: January 10, 2011                                    /s/ Hugh W. Brenneman, Jr.
                                                           HUGH W. BRENNEMAN, JR.
                                                           United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report. All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).